## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

|                                         |     |                       |
| --------------------------------------- | --- | --------------------- |
| DAVID F. GARCEAU, II,                   | :   |                       |
|                                         | :   |                       |
| Plaintiff                               | :   | No. 3:15-CV-1605      |
|                                         | :   |                       |
| vs.                                     | :   | (Judge Nealon)        |
|                                         | :   |                       |
| CAROLYN W. COLVIN, Acting               | :   |                       |
| Comissioner of Social Security,         | :   |                       |
|                                         | :   |                       |
| Defendant                               | :   |                       |

## **MEMORANDUM**

On August 17, 2015, Plaintiff, David F. Garceau, II, filed this instant

appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner

of the Social Security Administration ("SSA") denying his applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI")[2]

under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461 et seq. and 42

U.S.C. § 1381 et seq., respectively.  (Doc. 1).  The parties have fully briefed the

appeal.  For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's applications for DIB and SSI will be affirmed.

---

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2.  Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his applications for DIB and SSI on August 12, 2013, alleging disability beginning on July 16, 2013, due to a combination of major depression with recurring episodes, minimal change disease, hypertension, degenerative spinal disease, alopecia totalis, cirrhosis, migraines, bipolar disorder, nephrotic syndrome, and acid reflux. (Tr. 23, 244).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on January 22, 2014.  (Tr. 23).  On February 12, 2014, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 23).  A hearing was held on August 19, 2014, before administrative law judge Barbara Artuso ("ALJ"), at which Plaintiff, Plaintiff's mother, and an impartial vocational expert, Mitchell A. Schmidt, ("VE") testified.  (Tr. 23).  On September 26, 2014, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra,

---

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on October 2, 2015.  (Doc. 7).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Plaintiff could perform light work with limitations.  (Tr. 29).

On November 19, 2014, Plaintiff filed a request for review with the Appeals Council.  (Tr. 18).  On June 11, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on August 17, 2015.  (Doc. 1).  On October 2, 2015, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 6 and 7).  Plaintiff filed a brief in support of his complaint on October 26, 2015.  (Doc. 8).  Defendant filed a brief in opposition on November 30, 2015.  (Doc. 9).  On December 11, 2015, the action was dismissed without prejudice subject to renewal within thirty (30) days upon Plaintiff presenting evidence that he did not receive the Appeals Council's notice within the five (5) day presumption period in order for his claim to be administratively exhausted.  (Doc. 10).  On March 3, 2016, in compliance with the previous Order and upon proof that Plaintiff did not receive the notice within the presumption period, this Court reinstated the action and deemed Plaintiff's appeal to be timely filed.  (Doc. 12).  Plaintiff was also granted thirty (30) days to file a reply brief from the date of reinstatement, but did not do so.  (Doc. 12).

Plaintiff was born in the United States on April 8, 1980, and at all times

relevant to this matter was considered a "younger individual."[6]  (Tr. 228).

Plaintiff completed two (2) years of college, and can communicate in English.  (Tr.

243, 245).  His employment records indicate that he previously worked as a

laborer, loan counselor, maintenance worker, market researcher, and a utilization

review coordinator.  (Tr. 232).

In a document entitled "Function Report - Adult" filed with the SSA on

December 9, 2013,  Plaintiff indicated that he lived in a house with his family.

(Tr. 288).  From the time he woke up until he went to bed, Plaintiff showered,

watched television, rested, ate his meals, and went to any scheduled appointments.

(Tr. 287).  Plaintiff was able to take care of his personal needs, prepare his own

meals daily for fifteen (15) minutes at a time, do the laundry, vacuum, take out the

trash, grocery shop once a month for about an hour, and drive a car.  (Tr. 284-

287).  When asked to check items which his "illnesses, injuries, or conditions

affect," Plaintiff did <u>not</u> check reaching, kneeling, talking, hearing, stair climbing,

seeing, memory, understanding, following instructions, or using hands.  (Tr. 283).

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45.  <u>See</u> Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

He was able to walk about fifty (50) yards before needing to stop and rest for about three (3) to five (5) minutes.  (Tr. 283).

Regarding his concentration and memory, Plaintiff did not need special reminders to go places, to take care of his personal needs, or to take his medicine.  (Tr. 284, 286).  He could count change, handle a savings account, and use a checkbook, but did not pay bills because he could not afford to pay all of them.  (Tr. 285).  He did not finish what he started, could pay attention for a half hour, followed written and spoken instructions "good," and handled stress and changes in routine poorly.  (Tr. 282-283).

Socially, Plaintiff went outside three (3) times a day, was able to attend his mental health appointment and go grocery shopping on a daily basis unattended, and spent time with others both in person and on the phone.  (Tr. 284-285).  His hobbies and interests included watching television and "tie flys" on a daily basis.  (Tr. 284).  He reported that he had no problems getting along with others.  (Tr. 281-282).

In a Supplemental Questionnaire regarding pain, Plaintiff indicated that his pain began in 2001 after heavy lifting resulted in a herniated disc, and that it was stabbing and sharp in nature.  (Tr. 277, 291).  He stated that his pain changed depending on activity.  (Tr. 277, 291).  The location of his pain was in his lumbar

region down his legs.  (Tr. 277, 291).  He avoided all physical activities because they increased his pain.  (Tr. 277).  His pain was worse in the morning, occurred daily, and lasted for a few hours to days.  (Tr. 277, 291).  Ibuprofen did not relieve his pain, and Plaintiff had tried physical therapy, hot showers, a TENS unit, and cortisone shots to relieve his pain.  (Tr. 279, 293).

In a Supplemental Questionnaire for fatigue, Plaintiff noted that his fatigue began in 2006 due to depression, bipolar disorder medication, and mitral valve regurgitation, that it was worse in the afternoon and evenings, that it occurred daily, that it lasted a few hours to days, and that it was relieved by sleep.  (Tr. 278, 292).

At his hearing, Plaintiff indicated that he could not work due to a combination of depression as a result of alopecia, a ruptured disc in his back, hypertension, migraines, and minimal change disease for nephrotic syndrome, . (Tr. 54-55, 62).

Regarding medications, Plaintiff testified that he was taking Soboxone for drug addiction issues, and that it was helpful.  (Tr. 56).  He was also taking Zyprexa, Effexor, Lamictal, a tapered dose of Prednisone, and Metoprolol.  (Tr. 56).  Some side effects from these medications noted by Plaintiff included drowsiness, fatigue, and issues with focus and concentration.  (Tr. 57).  He also

indicated that he saw a therapist every two (2) weeks for his mental health and drug addiction issues.  (Tr. 57).

Regarding his mental health impairments, Plaintiff testified that he had Bipolar Disorder, which caused him to isolate himself during "those really bad depressive times."  (Tr. 60).  He stated, "Again I put a lot of emphasis on what other people are thinking about me.  It makes it hard and - - with coworkers or dealing with the public."  (Tr. 60-61).  He stated that his memory, concentration, focus, and ability to get along with others were affected by his mental health problems.  (Tr. 63).

Regarding physical impairments, Plaintiff testified that he experienced back pain, elbow pain, and patellofemoral pain.  (Tr. 61).  His back pain made him avoid lifting because he wanted to avoid narcotics, as he had addiction problem with them.  (Tr. 63).  Sitting also exacerbated his back pain.  (Tr. 63).  He stated that he could lift no more than twenty (20) pounds. (Tr. 63).  He stated that he had experienced about four (4) or five (5) relapses of nephrotic syndrome that required large amounts of steroids.  (Tr. 62).

Regarding activities of daily living, Plaintiff testified that he was able to take care of his personal needs, prepared one (1) meal a day, watched television, attended any scheduled doctor's appointments, did his own laundry, would

sometimes cook for his family, would vacuum when he was capable, shopped for groceries, and took care of his dog.  (Tr. 63-65).

## MEDICAL RECORDS

The medical records for the relevant time period of Plaintiff's alleged onset date of July 16, 2013, through the date of the ALJ's decision of September 26, 2014, will be reviewed and summarized.

### A.   Physical Impairments

#### 1.   Endocarditis

On October 6, 2013, Plaintiff presented to Mount Nittany Hospital due to complaints of fatigue, shortness of breath, fever, nausea, and an occasional cough that had been occurring for the past few months.  (Tr. 694, 699).  Cardiac testing revealed Plaintiff had acute infectious endocarditis and severe mitral valve regurgitation due to a history of intravenous heroin abuse.  (Tr. 688, 694, 699-701, 730-743, 775).  For treatment, Plaintiff received intravenous antibiotics for six (6) weeks.  (Tr. 717, 720, 722).  Plaintiff was discharged on October 15, 2013 with diagnoses of acute endocarditis, acute systolic heart failure, severe mitral valve regurgitation, IV drug abuse, hypertension, and psoriasis.  (Tr. 720, 797, 803).

Plaintiff was admitted to Hershey Medical Center from October 16, 2013 to October 25, 2013 for the aforementioned diagnoses of his heart after his symptoms

8

returned several hours after discharge from Mount Nittany Hospital.  (Tr. 817-818).  He was given intravenous antibiotic treatment for strep viridans mitral valve endocarditis.  (Tr. 818).

On January 2, 2014, Plaintiff has a pre-surgical appointment with Jason Fragin, D.O., to discuss mitral valve repair options.  (Tr. 1098).

On March 11, 2014, Plaintiff  underwent a mitral valve repair performed by Behzad Soleimani, M.D.  (Tr. 1124).

On March 31, 2014, at a post-surgical follow-up appointment, Dr. Soleimani noted that a Transesophageal Echocardiogram Report ("TEE") study revealed no mitral regurgitation or stenosis, and that the valve repair was a success.  (Tr. 1096, 1116).

### 2.  Knee, Hip, and Back Impairments

On October 2, 2013, Plaintiff underwent an x-ray of his left knee that showed no abnormalities.  (Tr. 765).  He also underwent an x-ray of his lumbar spine due to a history of spondylosis, and this x-ray revealed mild levoscoliosis. (Tr. 766).  An x-ray of his right hip was negative for abnormalities.  (Tr. 767).

### 3.  Nephrotic Syndrome

On March 23, 2013, Thomas E. Covaleski, M.D., examined Plaintiff at the Mount Nittany Medical Center, when he was admitted for intoxication, and noted

that his past medical history included "Nephrotic syndrome as a child which has resolved." (Tr. 648). On November 15, 2013, Dr. Dranov noted that Plaintiff had childhood nephrotic syndrome, but that a biopsy demonstrated it to be a "nil" disease. (Tr. 857, 867). The renal biopsy showed no pathologic diagnosis, and Plaintiff's renal function had remained stable. (Tr. 425). Dr. Dranov noted on March 5, 2013, that Plaintiff did not have "any sense that his nephrotic syndrome has recurred." (Tr. 416). In December 2013, Dr. Pote noted that Plaintiff had nephrotic syndrome that was in remission. (Tr. 857).

**B.    Mental Health Impairments**

From October 2013 forward, Plaintiff had an appointment once a month with Timothy Derstine, M.D. for depression, drug addiction, and bipolar disorder. (Tr. 837). The treatment notes from these visits are largely illegible. (Tr. 837-842).

On March 28, 2013, Dr. Derstine noted that Plaintiff had previously been in three (3) to four (4) different drug treatment programs, had been psychiatrically hospitalized three (3) or four (4) times in the past, and that he had relapsed one month after a recent inpatient rehabilitation stay in Roxbury a year earlier. (Tr. 847). Dr. Derstine noted that Plaintiff reported actively doctor-seeking, hospital surfing, and lying about his medical conditions in order to obtain controlled

prescriptions.  (Tr. 847).

On April 23, 2013, it was noted that Plaintiff was "'struggling not to use,'" that he was using more days out of the week progressively and using more drugs when he would use, that he was using opioids and heroin, that he binged for four (4) to five (5) days at a time, that he intermittently started to use crack cocaine, and that, despite his use, he had been going to work.  (Tr. 843).  His physical examination revealed a goal-directed thought process, good eye contact, a constricted and blunt affect, and impaired insight.  (Tr. 843).  His diagnoses included Bipolar Disorder and Polysubstance Abuse.  (Tr. 843).  It was recommended that he should attend an intensive outpatient program, but he was not willing to do so.  (Tr. 843).

On September 23, 2013, Dr. Derstine reported that Plaintiff was still using heroin and drinking.  (Tr. 830).  Plaintiff was attending therapy sessions with Tina Tiberio, LCSW.

In November and December of 2013, Plaintiff had appointments with William Milchak, LCSW, for counseling for his mental health impairments.  (Tr. 1004-1007).  It was noted that while Plaintiff was adequately addressing his mental health issues, he did not have the "same level of commitment to his co-occurring addiction" and remained at risk for relapse if he did not enter the

recovery community.  (Tr. 1007).

On April 24, 2014, Dr. Derstine noted that Plaintiff was recovering from mitral valve repair surgery a month earlier and had started cardiac rehabilitation. (Tr. 1231-322).

C.     **Consultative Examinations**

1.      **Psychological Consultative Examination**

On November 12, 2013, Plaintiff underwent a consultative examination performed by John A. Jubala, Ph.D.  (Tr. 971).  Plaintiff's psychiatric history included  noted that a diagnosis of major depressive disorder recurrent, severe, and polysubstance dependence in full sustained remission.  (Tr. 971).  It was noted that Plaintiff had presented for psychiatric inpatient hospitalizations five (5) times, andn had attended four (4) or five (5) drug and alcohol rehabilitation.  (Tr. 971-972).   Plaintiff reported that he had not abused any substances for about two (2) months.  (Tr. 971).  Dr. Jubala diagnosed bipolar disorder, not otherwise specified; major depressive disorder, recurrent, severe; posttraumatic stress disorder; and a history of polysubstance abuse in early sustained remission.  (Tr. 973).  Dr. Jubala assessed a Global Assessment of Functioning (GAF) score of fifty-five (55), indicating some moderate difficulties in social or occupational functioning.  (Tr. 973).  Dr. Jubala noted that Plaintiff was able to shop, cook, clean, pay bills, and

12

take care of his personal needs; was able to get along with others with some difficulty relating to the general public due to anxiety; had difficulty sustaining attention and could no longer read a book; and remembered his appointments independently.  (Tr. 974).  In a Medical Source Statement, Dr. Jurbala opined that Plaintiff: could understand, remember, and carry out simple instructions, but not complex ones, and had no limitation on his ability to interact appropriately with supervisors, coworkers, and the public.  (Tr. 975-976). When responding to a question about whether alcohol and or substance abuse contributed to any of Plaintiff's limitations, Dr. Jubala responded that this question did not currently apply.  (Tr. 978).

### 2.     Physical Consultative Examination

On December 30, 2012, Plaintiff underwent a physical consultative examination performed by Harry H. Pote, M.D., examined Plaintiff on December 30, 2012.  (Tr. 1077-90).  It was noted that: Plaintiff had nephrotic symdrome as a child that was in remission on the date of the examination; had degenerative joint disease of his spine with lumbar disc protrusion; had psychological issues, including Bipolar Disorder, that caused him to be hospitalized on many occasions; had alopecia universalis; and had a history of drug abuse for opiates and heroin.  (Tr. 1079).  Dr. Pote completed a Medical Source Statement in which he opined

that Plaintiff: could frequently lift and/ or carry up to ten (10) pounds and occasionally lift and/ or carry up to twenty (20) pounds; could frequently reach in all directions, handle, finger, and feel with his bilateral hands and occasionally push/ pull; could sit for four (4) hours, stand for two (2) hours, and walk for one (1) hour without interruption; could sit for six (6) hours, stand for four (4) hours, and walk for two (2) hours in an eight (8) hour workday; could frequently bilaterally operate foot controls; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch or crawl; could never climb ladders or scaffolds; could occasionally be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, and vibrations; could never be exposed to dusts, odors, fumes, pulmonary irritants, or extreme temperatures; could frequently be exposed to loud noise; and had no limitations on shopping, traveling, using public transportation, preparing a simple meal, or climbing a few steps.  (Tr. 1083-1088).  He stated these limitations would last "at least until mitral valve surgery."  (Tr. 1088).

**D.     State Agency Physicians**

   **1.     Phyllis Brentzel, Psy.D.**

On November 22, 2013, Dr. Brentzel performed a Psychiatric Review Technique for Plaintiff's mental health impairments based on a review of the

medical record.  (Tr. 103-104).  She opined that, for Listings 12.04 (Affective

Disorders), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction

Disorders), Plaintiff had: mild restriction of activities of daily living and in

maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, or pace; and no repeated episodes of decompensation.  (Tr. 104).  Dr.

Brentzel also completed a Mental Residual Functional Capacity Assessment.  (Tr.

106-108).  She opined Plaintiff was moderately limited in her ability to maintain

attention and concentration for extended periods; to perform activities within a

schedule, maintain regular attendance, and be punctual within customary

tolerances; and to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent

pace without an unreasonable number and length of rest periods.  (Tr. 107).  She

opined that Plaintiff was not significantly limited in any other areas, and had no

social interaction or adaptation limitations.  (Tr. 107).

### 2.    Juan B. Mari-Mayans, M.D.

On January 17, 2014, Dr. Mayans completed a Physical Residual Functional

Capacity Assessment form for Plaintiff.  (Tr. 105-106).  He opined Plaintiff: could

occasionally lift and/ or carry up to twenty (20) pounds and frequently lift and/ or

carry up to ten (10) pounds; stand and/ or walk and sit for about six (6) hours in an

eight (8) hour workday; engage in unlimited pushing and pulling within the aforementioned weight restrictions; and had no other limitations. (Tr. 105-106).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant

numbers either in the region where such individual lives or in
several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").  "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## **ALJ DECISION**

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2018.  (Tr. 25).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from his alleged onset date of July 16, 2013.  (Tr.

25).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "degenerative disc disease of the lumbar spine with radiculopathy; herniated nucleus pulposus; lumbosacral facet arthrosis; migraine headaches; hypertension; systolic heart failure; severe mitral valve regurgitation status post-surgical repair; endocarditis; pulmonary edema; bacteremia; hemoptysis; history of sepsis; bipolar disorder; major depressive disorder, recurrent, severe; anxiety disorder, NOS; post-traumatic stress disorder; opiated dependency; and history of polysubstance abuse (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 25-26).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 26-29).

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

At step four, the ALJ determined that Plaintiff had the RFC to perform light

work. (Tr. 22). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform light work as
> defined in 20 C.F.R. 404.1567(b) and 416.967(b), except he is
> limited to occasional pushing and pulling with the upper
> extremities and frequent not constant reaching, handling,
> fingering, feeling, or use of foot controls; is limited to never
> climbing ladders ropes or scaffolds; is limited to occasional
> climbing of ramps and stairs; is limited to occasional balancing,
> stooping, kneeling, crouching and crawling; is limited to
> occasional exposure to work place hazards, humidity, wetness,
> and vibration; is limited to no exposure to extreme cold,
> extreme heat, and pulmonary irritants; and is limited to jobs
> requiring understanding, remembering, and carrying out only
> simple instructions and making only simple work-related
> decisions, involving no interaction with the general public and
> only occasional interaction with co-workers and supervisors.

(Tr. 29).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the his age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 36-37).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between July 16, 2013, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 37).

## **DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred by finding that his mental health impairments did not meet any mental disorder Impairment Listings; (2) the ALJ erred by finding Plaintiff's nephrotic syndrome was not a severe impairment; and (3) the ALJ erred in rejecting evidence for unsupported reasons to include lay witness testimony that was ignored.  (Doc. 8, pp. 3-9).  Defendant disputes these contentions.  (Doc. 9, pp. 16-28).

### 1.    **Mental Health Impairment Listings- Step Three**

Plaintiff asserts that the ALJ erred in finding that Plaintiff has not experienced any psychiatric hospitalization because Plaintiff was hospitalized for psychiatric reasons in 2006, 2010, 2011, and 2012, and these hospitalizations provided evidence of repeated episodes of decompensation.  (Tr. 4-5).  He further asserts that the ALJ mischaracterized the record by "incorrectly finding the plaintiff did not receive frequent out patient mental health treatment" and "refused inpatient treatment for his drug and alcohol problems."  Plaintiff argues that, due to these errors, the ALJ incorrectly analyzed the medical evidence and erred in determining that Plaintiff's mental health impairments did not meet the Listing of Impairments for Mental Disorders at Step Three of the Sequential Evaluation

Process.  (Tr. 5-6).

A claimant bears the burden of showing that her impairment meets or equals a listed impairment, and that he is thus presumptively disabled.  Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)).  A plaintiff must meet all of the specified requirements of a Listing in order to be considered presumptively disabled.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1. Listings of Impairments for Mental Heath Disorders consists of paragraph A criteria that involves a set of medical findings, paragraph B criteria that involves a set of impairment-related functional limitations, and paragraph C criteria that involves a set of additional functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

The required level of severity for Listing 12.04  is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Paragraph "B" of these Listings requires two (2) of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt.

P, App. 1, §§ 12.04(B), 12.06(B).  Listing 12.04 paragraph "C" requires

demonstration of a medically documented history of a chronic affective disorder of

at least two (2) years duration that has caused more than a minimal limitation of

ability to do basic work activities, with symptoms or signs currently attenuated by

medical or psychosocial support, and one (1) of the following: (1) repeated and

extended episodes of decompensation; (2) a residual disease process that has

resulted in such marginal adjustment that even a minimal increase in mental

demands or change in the environment would be predicted to cause the individual

to decompensate; or (3) a current history of one (1) or more years' inability to

function outside a highly supportive living arrangement, with an indication of

continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.04(C)(1)-(3).

Listing 12.06, Anxiety Disorders, provides as follows:

A. Medically documented findings of at least one of the
following:

1. Generalized persistent anxiety accompanied by
three out of four of the following signs or
symptoms:

a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

      C. Resulting in complete inability to function independently
      outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06.  A claimant meets

Listing 12.06 when the requirements of both A and B are satisfied, or when the

requirements of both A and C are satisfied.

Initially, this Court finds that Plaintiff's argument that medical evidence

shows psychiatric hospitalizations during the relevant time period is unfounded.

Plaintiff had no psychiatric hospitalizations during the relevant time period of July

16, 2013 through the date of the ALJ's decision.  As such, there is no evidence

that Plaintiff experienced repeated episodes of decompensation each of extended

duration, and thus the ALJ did not err in making this determination.  (Tr. 26, 38).

To the extent that Plaintiff is arguing that he met criteria "B" of the mental

disorder listings noted above, substantial evidence supports the ALJ's decision

that Plaintiff: (1) had only mild restrictions in activities of daily living, as he was

able to cook, clean, take care of his girlfriend's child and dog, shopped, did

laundry, used a checkbook, spent time with others, and visited relatives; (2) had

moderate difficulties in social functioning based on the opinion of Dr. Jubala that

Plaintiff had some difficulty dealing with the general public due to social anxiety;

and (3) moderate difficulties in concentration, persistence, or pace because

Plaintiff himself stated he could pay attention for thirty (30) to sixty (60) minutes and followed instructions well, and the medical evidence showed that Plaintiff's attention span, concentration, and memory were "grossly intact." (Tr. 26-28, 1201).

Substantial evidence also supports the ALJ's decision that Plaintiff did not meet criteria "C" for these Listings because, as noted by the ALJ:

> As to the "paragraph C" criteria of Listing 12.04, the evidence does not reveal that [Plaintiff] has a medically documented history of a chronic organic or affective disorder of at least two years' duration that has caused more than a minimal limitation on his ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support with repeated episodes of decompensation; has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment would be predicted to cause him to decompensate; or has a current history of one or more years' inability to function outside a highly supportive living arrangement. Also, [Plaintiff] has not receive frequent outpatient mental health treatment and has never attended a partial hospitalization program. (Exhibits 3E, 8E, 9E, 4F, 5F, 9F, 10F, 11F. 12F, 13F, 14F, 15F, 16F, 17F and 18F).

> As to the "paragraph C" criteria of Listing 12.06, the evidence does not reveal [Plaintiff] experience a complete inability to function outside the area of his home. The progress notes and reports from treating and examining physicians do not contain any references that [Plaintiff] has problems interacting or communicating, or that he ahs had shifts in anxiety (Exhibits 4F, 5F, 9F, 10F, 11F, 12F, 13F, 14F, 15F, 16F, 17F and 18F). In November 2013 Dr. Jubala reported in treatment notes that

> [Plaintiff] was friendly with neighbors, was able to get along
> with his family, and had a few friends (Exhibit 11F).
> Additionally, [Plaintiff] testified he goes to the grocery store,
> and he reestablished a relationship with his sister and nephew
> and he went to Hershey Park with his sister and nephew.

(Tr. 28-29).

As such, substantial evidence supports the ALJ's Step Three finding that

Plaintiff's mental health impairments did not meet any Listings because the

evidence Plaintiff mentions to support his argument pre-date the relevant time

period and because the ALJ fully supported his determination with the medical

evidence.  The ALJ's decision will not be disturbed on appeal based on this

assertion.

### 2.      Nephrotic Syndrome- Step Two

Plaintiff asserts that the ALJ erred in finding that his nephrotic syndrome

was not a severe impairment.  (Doc. 8, pp. 6-8).

Step Two "'is a threshold analysis that requires [a claimant] to show that he

has one severe impairment.'"  Traver v. Colvin, 2016 U.S. Dist. LEXIS 136708, at

*29 (M.D. Pa. Oct. 3, 2016) (Conaboy, J.) (citing Bradley v. Barnhart, 175

F.App'x 87 (7th Cir. 2006)).  SSR 96-3p states that an impairment is considered

severe if it "significantly limits an individual's physical or mental abilities to do

basic work activities."  SSR 96-3p.  An impairment is not severe if it is a slight

abnormality that has no more than a minimal effect on the Plaintiff's ability to do basic work activities.  Id.  Furthermore, the United States Court of Appeals for the Third Circuit has held that as long as the ALJ finds at least one (1) impairment to be severe at Step Two, that step is resolved in Plaintiff's favor, the sequential evaluation process continues, and any impairment that is found to non-severe is harmless error because the ALJ still has to consider all impairments, both severe and non-severe, in the RFC analysis.  See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); see also Salles v. Commissioner of Social Security, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [the plaintiff's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005))); Popp v. Astrue, 2009 U.S. Dist. LEXIS, *4 (W.D. Pa. April 7, 2009) ("The Step Two determination as to whether Plaintiff is suffering from a severe impairment is a threshold analysis requiring the showing of only one severe impairment . . . In other words, as long as a claim is not denied at Step Two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairment to be severe.") (citations omitted).

In the case at hand, the ALJ found several of Plaintiff's impairments to be

severe at Step Two, and thus resolved this step in Plaintiff's favor and continued

the sequential evaluation process. (Tr. ). He found Plaintiff's nephrotic syndrome

to be non-severe because the evidence did not show that Plaintiff experienced

significant limitations as a result of this impairment or that he required frequent

treatment for it. (Tr. 26). The ALJ discusses several key pieces of medical

evidence that support his determination that Plaintiff's nephrotic syndrome was

non-severe for the relevant time period, including the following: (1) on March 23,

2013, Thomas E. Covaleski, M.D., examined Plaintiff at the Mount Nittany

Medical Center, when he was admitted for intoxication, and noted that his past

medical history included "Nephrotic syndrome as a child which has resolved;" (2)

on November 15, 2013, Dr. Dranov noted that Plaintiff had childhood nephrotic

syndrome, but that a biopsy demonstrated it to be a "nil" disease; (3) a renal

biopsy showed no pathologic diagnosis, and Plaintiff's renal function had

remained stable; (4) Dr. Dranov noted on March 5, 2013, that Plaintiff did not

have "any sense that his nephrotic syndrome has recurred;" and (5) In December

2013, Dr. Pote noted that Plaintiff's nephrotic syndrome was in remission. (Tr.

31, 416, 425, 648, 857, 867). There is no indication in the medical records for the

relevant time period that Plaintiff was being treated for nephrotic syndrome. Thus,

substantial evidence support the ALJ's determination that Plaintiff's nephrotic

syndrome was non-severe, and the decision will not be disturbed on appeal based on this assertion.

### 3.  <u>Lay Testimony</u>

Lastly, Plaintiff argues that the ALJ did not properly evaluation the testimony provided by his mother, Natalie Garceau.  (Doc. 8, pp. 9).

In the decision, the ALJ stated, "[Plaintiff]'s mother testified that [he] has had nephrotic syndrome since he was four years old, has aolpecia which has affected his mental health and caused him not to want to go to school, and was getting involved with alcohol and drugs."  (Tr. 30).  The ALJ gave consideration to this testimony, and concluded that she did not find it persuasive because it was inconsistent with the objective medical findings, "as discussed above."  (Tr. 35). Therefore, there is no indication that the ALJ ignored the testimony provided by Plaintiff's mother, and substantial evidence as discussed by the ALJ throughout the opinion supports the ALJ's determination that Plaintiff's mother's testimony was inconsistent with the objective medical evidence for the relevant time period. (Tr. 26-32).  Furthermore, Plaintiff testified that he was able to cook, clean, take care of his girlfriend's child and dog, shopped, did laundry, used a checkbook, spent time with others, and visited relatives.  (Tr. 26-28).  As such, substantial evidence the ALJ's analysis of Plaintiff's mother's testimony, and the ALJ's

decision will not be disturbed on appeal based on this assertion.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: March 23, 2017

/s/ **William J. Nealon**
**United States District Judge**